# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DAWN CHERRY, Derivatively and on Behalf of SAREPTA THERAPEUTICS, INC., | ) ) ) ) | CIVIL ACTION NO. |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| M. KATHLEEN BEHRENS, ANTHONY CHASE, WILLIAM GOOLSBEE, CHRISTOPHER GARABEDIAN, SANDESH MAHATME, EDWARD M. KAYE, GIL PRICE, JOHN HODGMAN and HANS WIGZELL, | ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) ) | |
| and | ) ) | JURY TRIAL DEMANDED |
| SAREPTA THERAPEUTICS, INC., | ) ) | |
| Nominal Defendant. | ) ) ) | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Dawn Cherry ("Plaintiff"), by her undersigned attorneys, derivatively and on behalf of Nominal Defendant Sarepta Therapeutics, Inc. ("Sarepta" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants M. Kathleen Behrens, Anthony Chase, William Goolsbee, Christopher Garabedian, Sandesh Mahatme, Edward M. Kaye, Gil Price, John Hodgman, and Hans Wigzell (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of Sarepta, unjust enrichment, waste of corporate assets, abuse of control, and gross mismanagement. As for her complaint against the

1

Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, the United States Food And Drug Administration ("FDA") filings, wire and press releases published by and regarding Sarepta, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Sarepta's directors and officers from July 10, 2013 to the present (the "Relevant Period").

2.      Sarepta is a biopharmaceutical company focused on the discovery and development of unique RNA-targeted therapeutics for the treatment of rare, infectious and other diseases.  The Company primarily focuses on the rapid advance and development of potentially disease-modifying drug candidates.  Sarepta's leading drug is eteplirsen, developed to treat Duchenne Muscular Dystrophy ("DMD").  Eteplirsen is designed to address the underlying causes of DMD.

3.      During the Relevant Period, the Individual Defendants breached their fiduciary duties in authorizing the Company to make materially false and/or misleading statements about Sarepta's business prospects in connection with its development of eteplirsen.  Specifically, the

Individual Defendants failed to disclose that: (1) Sarepta failed to provide sufficient data for its New Drug Application ("NDA") submissions for eteplirsen; (2) the Company's NDA for eteplirsen would likely be filed in mid-2015, not by the end of 2014; and therefore, (3) the Company's statements about its business, operations, and projections, including statements about eteplirsen's prospects for FDA approval, were materially false and misleading and/or lacked a reasonable basis.

4.      On October 27, 2014, the Company and Defendant Garabedian, who was at the time the Company's CEO and President and a Company Director, disclosed the truth, that:  (1) Sarepta could not submit an NDA for eteplirsen by the end of 2014, and (2) the FDA guidance identified deficiencies in Sarepta's submissions that rendered it impossible for the Company to submit an NDA for eteplirsen earlier than mid-year 2015.

5.      On this disclosure, Sarepta shares slid $7.65 per share from closing price of $23.56 on Friday, October 24, 2014, closing 32% lower, to close at $15.91 per share on Monday, October 27, 2014.

6.      The Company's public misrepresentations about its operations and financial prospects exposed it and certain of the Individual Defendants named herein to liability under the federal securities laws in a class action that is pending in this court, captioned *Kader v. Sarepta Therapeutics, Inc., et al.*, Case No. 14-cv-14318-ADB.

7.      Every Individual Defendant ignored the red flags that Garabedian, Kaye and Mahatme were making false and misleading statements regarding the development and prospects of eteplirsen.

8.      Indeed, previous statements uttered and caused to be made by these Defendants resulted in securities fraud class action lawsuits against the Company before the filing of *Kader v. Sarepta Therapeutics, Inc., et al.*, Case No. 14-cv-14318-ADB.   Moreover, the Individual Defendants were on notice that the Company was repeatedly unable to comply with FDA requirements, but they nonetheless made the misleading statements to raise money through public offerings of artificially inflated stock.

9.      As set forth more fully herein, almost every Individual Defendant was on the Board during the class period, from July 10, 2013 through November 11, 2013, as set forth in the previously filed class actions in connection with Sarepta's statements about eteplirsen development and consideration by the FDA in 2013.   *See Baradarian v. Sarepta Therapeutics, Inc. , et al.*, Case No. 14-cv-10225-IT (filed Jan. 29, 2014, D. Mass.) and *Corban v. Sarepta Therapeutics, Inc. , et al.*, Case No. 14-cv-10201-IT (filed July 21, 2014, D. Mass.).

10.      Moreover, three of the four Individual Defendants on the Board's Audit Committee, who constitute half the current Board, were expressly obligated under the Audit Committee Charter to oversee and vet the false and misleading statements made by Garabedian, Kaye and Mahatme and all other statements in the Company's press releases and financial statements during the Relevant Period, but failed to do so.

11.      In light of the Individual Defendants' conduct, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

12.      The Company has been substantially damaged as a result of the Individual Defendants' knowing or reckless breaches of fiduciary duty and other misconduct.

## JURISDICTION AND VENUE

13.     Diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

14.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he is an individual who is a citizen of Massachusetts or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

15.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

16.     Plaintiff is a current shareholder of Sarepta common stock. Plaintiff has continuously held Sarepta common stock at all relevant times. Plaintiff is a citizen of Illinois.

### Nominal Defendant

17.     Nominal Defendant Sarepta is a Delaware corporation with its principal executive offices at 215 First Street, Suite 415, Cambridge, Massachusetts 02142. Sarepta stock trades on the NASDAQ Global Market ("NASDAQ") under the ticker symbol "SRPT."

### Individual Defendants

18.     Defendant M. Kathleen Behrens ("Behrens") has served as a member of the Sarepta Board since March 2009 and was appointed Chairwoman of the Board on April 16,

2015.  Defendant Behrens is also Chairwoman of the Audit Committee and a member of the Nominating and Corporate Governance Committee.  According to the Company's Schedule 14A filed with the SEC on April 30, 2015 ("2015 Proxy Statement), as of April 8, 2015, Defendant Behrens owned 84,916 shares of Sarepta stock.  Given that the price per share of the Company's common stock at the close of trading on April 8, 2015 was $14.23, Behrens owned $1,208,354 worth of Sarepta stock.  For her services on the Board, the Company paid Defendant Behrens $416,093 in fees, stock awards and other compensation for 2014; and $559,707 in 2013.  Upon information and belief, Defendant Behrens is a citizen of California.

19.     Defendant William A. Goolsbee ("Goolsbee") has served as a member of the Board since October 2007.  Previously, Defendant Goolsbee was Chairman of the Board from June 2010 to July 2014.  Presently, Defendant Goolsbee is Chairman of the Compensation Committee and a member of the Research and Development Committee, having served as a member of the Audit Committee during the Relevant Period.   Goolsbee founded ImmunoTherapy Corporation ("ImmunoTherapy") in 1993 and served as its chairman of the board of directors in 1995.  Defendant Goolsbee acted as chairman until ImmunoTherapy was acquired by Sarepta in 1998.  According to the Company's 2015 Proxy Statement, as of April 8, 2015, Defendant Goolsbee owned 48,082 shares of Sarepta stock.  Given the price per share of the Company's common stock at the close of trading on April 8, 2015 was $14.23, Goolsbee owned $684,206 worth of Sarepta stock.  For his services on the Board, the Company paid Defendant Goolsbee $446,093 in fees, stock awards and other compensation in 2014; and $617,040 in 2013.  Upon information and belief, Defendant Goolsbee is a citizen of New York.

20.     Defendant Gil Price ("Price") has served as a director of the Company since October 2007.  Defendant Price currently sits on the Audit and Compensation Committees. According to the Company's 2015 Proxy Statement, as of April 8, 2015, Defendant Price owned 78,246 shares of Sarepta stock.  Given the price per share of the Company's common stock at the close of trading on April 8, 2015 was $14.23, Price owned $1,113,440 worth of Sarepta stock. For his services on the Board, the Company paid Defendant Price $408,093 in fees, stock awards and other compensation in 2014; and $556,707 in 2013.  Upon information and belief, Defendant Price is a citizen of the District of Columbia.

21.     Defendant Hans Wigzell ("Wigzell") has been a member of the Board since June 2010.  Defendant Wigzell is Chairman of the Research and Development Committee and a member of the Nominating and Corporate Governance Committee.  According to the Company's 2015 Proxy Statement, as of April 8, 2015, Defendant Wigzell owned 51,750 shares of Sarepta stock.  Given the price per share of the Company's common stock at the close of trading on April 8, 2015 was $14.23, Wigzell owned $736,402 worth of Sarepta stock.  For his services on the Board, the Company paid Defendant Wigzell $392,093 in fees, stock awards and other compensation in 2014; and $541,123 in 2013.  Upon information and belief, Defendant Wigzell is a citizen of Sweden.

22.     Defendant Anthony Chase ("Chase") served as a member of the Sarepta Board from April 2010 to June 2015.  Defendant Chase has served as a member of the Audit and the Nominating and Corporate Governance Committee during the Relevant Period.  According to the Company's Schedule 14A filed with the SEC on April 30, 2015 ("2015 Proxy Statement), as of April 8, 2015, Defendant Chase owned 100,944 shares of Sarepta stock.  Given the price per

share of the Company's common stock at the close of trading on April 8, 2015 was $14.23, Chase owned $1,436,433 in Sarepta stock.  For his services on the Board, the Company paid Defendant Chase $400,093 in fees, stock awards and other compensation for 2014; and $550,373 in 2013.  Upon information and belief, Defendant Chase is a citizen of Texas.

23.     Defendant John Hodgman ("Hodgman") has served as a member of the Sarepta Board from March 2004 to date of June 2015.  From July 2014 to April 2015, Defendant Hodgman served as Interim Chairman of the Board.  According to the Company's 2015 Proxy Statement, as of April 8, 2015, Defendant Hodgman owned 84,916 shares of Sarepta stock. Given the price per share of the Company's common stock at the close of trading on April 8, 2015 was $14.23, Hodgman owned $665,252 worth of Sarepta stock.  For his services on the Board, the Company paid Defendant Hodgman $443,528 in fees, stock awards and other compensation in 2014; and $559,623 in 2013.  Upon information and belief, Defendant Hodgman is a citizen of Utah.

24.     Defendant Christopher Garabedian ("Garabedian") served as a member of the Board from June 2010 and president and chief executive officer ("CEO") from January 2011 through March 31, 2015, when he resigned from both positions.  Prior to coming to Sarepta, Defendant Garabedian served as vice president of corporate strategy at Celgene Corporation. According to the Company's 2015 Proxy Statement, as of April 8, 2015, Defendant Garabedian owned 689,818 shares of Sarepta stock.  Given the price per share of the Company's common stock at the close of trading on April 8, 2015 was $14.23, Garabedian owned $9,816,110 worth of Sarepta stock.  Sarepta paid Defendant Garabedian $5,003,026 in 2014 in salary, option awards and other compensation; in 2013, the Company paid Garabedian $9,701,492; and in

2012, Sarepta paid him $2,640,511.  Upon information and belief, Defendant Garabedian is a citizen of Massachusetts.

25.     Defendant Sandesh Mahatme ("Mahatme") has served as senior vice president and chief financial officer ("CFO") since November 2012.  Prior to November 2012, Defendant Mahatme worked in various roles at Celgene Corporation.  According to the Company's 2015 Proxy Statement, as of April 8, 2015, Defendant Mahatme owned 163,874 shares of Sarepta stock.  Given the price per share of the Company's common stock at the close of trading on April 8, 2015 was $14.23, Mahatme owned $2,331,927worth of Sarepta stock.  Sarepta paid Defendant Mahatme $2,183,029 in 2014 in salary, options awards and other compensation; in 2013, the Company paid Mahatme $3,879,070, and in 2012, Sarepta paid him $4,836,954.   Upon information and belief, Defendant Mahatme is a citizen of Massachusetts.

26.     Defendant Edward M. Kaye, M.D. ("Kaye") served as senior vice president and chief medical officer ("CMO") of Sarepta since June 2011 and interim CEO since April of 2015.  Prior to his appointment as CMO, Defendant Kaye was Group Vice President of Clinical Development at Genzyme Corporation, a biotechnology company, from April 2007 to June 2011.  According to the Company's 2015 Proxy Statement, as of April 8, 2015, Defendant Kaye owned 246,089 shares of Sarepta stock.  Given the price per share of the Company's common stock at the close of trading on April 8, 2015 was $14.23, Kaye owned $3,501,846 worth of Sarepta stock.  For his executive services at the Company, Sarepta paid Defendant Kaye in salary, stock and other compensation $1,703,921 in 2014; $2,648,950 in 2013; and $1,153,939 in 2012.  Defendant Kaye was appointed interim chief executive for the Company on April 20, 2015, following Defendant Garabedian's resignation from the Company on March 31, 2015, and

continued in his capacity as CMO and senior vice president of Sarepta. According to the employment agreement entered into between Defendant Kaye and the Company, Kaye will receive a base annual salary of $525,000. Defendant Kaye will also be eligible to receive a target annual bonus of 60% of his annual base salary, or $315,000, upon achievement of performance objectives to be determined by the Board. The maximum annual bonus Defendant Kaye will be eligible to receive is 150% of his annual target bonus, or $472,500. Defendant Kaye will also receive an award of restricted stock valued, on the date of grant, at $1,500,000. Upon information and belief, Defendant Kaye is a citizen of Massachusetts.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

27.     By reason of their positions as officers, directors and/or fiduciaries of Sarepta and because of their ability to control the business and corporate affairs of Sarepta, the Individual Defendants owed Sarepta and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Sarepta in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Sarepta and its shareholders so as to benefit all shareholders equally.

28.     Each director and officer of the Company owes to Sarepta and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

29.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Sarepta, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

30.     To discharge their duties, the officers and directors of Sarepta were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

31.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Sarepta, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware of, posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Sarepta's Board at all relevant times.

32.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Securities Exchange Act of 1934 ("Exchange Act") and traded on the NASDAQ, the Individual Defendants had a duty not to effect and to prevent the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information with respect to Sarepta's prospects for FDA eteplirsen approval.  The Individual Defendants had a duty to cause the Company to

disclose in its regulatory filings with the SEC that the Company's NDA needed further development, so that the market price of the Company's common stock would be based upon truthful and accurate information.

33.     To discharge their duties, the officers and directors of Sarepta were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Sarepta were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, the United States, and pursuant to Sarepta's own Code of Business Conduct and Ethics and internal guidelines;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Sarepta conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Sarepta and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Sarepta's operations would comply with all laws and Sarepta's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

34.     Each of the Individual Defendants further owed to Sarepta and the shareholders the duty of loyalty requiring that each favor Sarepta's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

35.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Sarepta and were at all times acting within the course and scope of such agency.

36.     Because of their advisory, executive, managerial, and directorial positions with Sarepta, each of the Individual Defendants had access to adverse, non-public information about the Company.

37.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Sarepta.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

38.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

39.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (ii) to conceal adverse information concerning the Company's operations, financial condition, competitors, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

40.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of Sarepta was a direct, necessary, and

substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

41.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

42.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Sarepta, and was at all times acting within the course and scope of such agency.

## CODE OF ETHICS

43.     Pursuant to the Company's Code of Business Conduct and Ethics (the "Code of Ethics"), the conduct of all of the Company's officers, directors, and employees is governed by the Code of Ethics.

44.     The Code of Ethics states, in pertinent part, that:

We are committed to maintaining the highest standards of honest and ethical business conduct, including ensuring full, fair, accurate, timely and understandable disclosures in our public documents and reports, compliance with applicable laws, prompt internal reporting of violations of these standards and accountability for adherence to these standards. This Code of Business Conduct and Ethics (the "Code") reflects the business practices and principles of behavior that support this commitment. Every employee, officer and director must read, understand and comply with the Code and its application to the performance of his or her business responsibilities. References in the Code to employees are intended to cover officers and, as applicable, directors, managers and supervisors as well as employees.

*****

Sarepta's integrity and reputation depend on the honesty, fairness and integrity brought to the job by each person associated with us. It is the responsibility of each employee to apply common sense, together with his or her own highest personal ethical standards, in making business decisions where there is no stated guideline in the Code. Unyielding personal integrity is the foundation of corporate integrity.

*****

## 1. Legal Compliance.

Obeying the law, both in letter and in spirit, is the foundation of this Code. Our success depends upon each employee operating within legal guidelines and cooperating with local, national and international authorities. It is therefore essential that you understand the legal and regulatory requirements applicable to your business unit and area of responsibility. We hold periodic training sessions to ensure that all employees comply with the relevant laws, rules and regulations associated with their employment, including laws prohibiting insider trading (which are discussed in further detail in Section 4 below). While we do not expect you to memorize every detail of these laws, rules and regulations, we want you to be able to determine when to seek advice from others. If you do have a question in the area of legal compliance, it is important that you not hesitate to seek answers from your supervisor or the Corporate Responsibility Officer (see Section 16).

Disregard of the law will not be tolerated. Violation of domestic or foreign laws, rules and regulations may subject an individual, as well as Sarepta, to civil and/or criminal penalties. You should be aware that conduct and records, including emails, are subject to internal and external audits, and to discovery by third parties in the event of a government investigation or civil litigation. It is in everyone's best interests to know and comply with our legal and ethical obligations.

*****

## 4. Insider Trading.

Employees who have access to confidential (or "inside") information are not permitted to use or share that information for stock trading purposes or for any other purpose except to conduct our business. All non-public information about Sarepta or about companies with which we do business is considered confidential information. To use material non-public information in connection with buying or selling securities, including "tipping" others who might make an investment decision on the basis of this information, is not only unethical, it is illegal. Employees must exercise the utmost care when handling material inside information. We have adopted a separate policy entitled Procedures and Guidelines Governing Insider Trading and Tipping to which you are bound as a condition of your

employment here. You should consult this policy for more specific information on the definition of "material inside information" and on buying and selling our securities or securities of companies with which we do business.

*****

### 6. Conflicts of Interest.

A "conflict of interest" occurs when an individual's personal interest may interfere in any way with the performance of his or her duties or the interests of Sarepta. A conflicting personal interest could result from an expectation of personal gain now or in the future or from a need to satisfy a prior or concurrent personal obligation. We expect our employees to be free from influences that conflict with the best interests of Sarepta. Even the appearance of a conflict of interest where none actually exists can be damaging and should be avoided. Whether or not a conflict of interest exists or will exist can be unclear. Conflicts of interest are prohibited unless specifically authorized as described below.

If you have any questions about a potential conflict or if you become aware of an actual or potential conflict, and you are not an officer or director of Sarepta, you should discuss the matter with your supervisor or the Corporate Responsibility Officer (as further described in Section 16). Supervisors may not authorize conflict of interest matters without first seeking the approval of the Corporate Responsibility Officer and filing with the Corporate Responsibility Officer a written description of the authorized activity. If the supervisor is involved in the potential or actual conflict, you should discuss the matter directly with the Corporate Responsibility Officer. Conflicts involving officers and directors must be reviewed by the Audit Committee and waivers of any conflict, or any provision of the Code for executive officers and directors must be approved by the full Board.

*****

### 7. Corporate Opportunities.

You may not take personal advantage of opportunities that are presented to you or discovered by you as a result of your position with us or through your use of corporate property or information, unless authorized by your supervisor, the Corporate Responsibility Officer or the Audit Committee, as described in Section 6. Even opportunities that are acquired privately by you may be questionable if they are related to our existing or proposed lines of business. Participation in an investment or outside business opportunity that is related to our existing or proposed lines of business must be pre-approved. You cannot use your position with us or corporate property or information for improper personal gain, nor can you compete with us in any way.

**8. Maintenance of Corporate Books, Records, Documents and Accounts; Financial Integrity; Public Reporting.**

The integrity of our records and public disclosure depends on the validity, accuracy and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries, whether they relate to financial results or test results, is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, creditors, employees and others with whom we do business. As a result, it is important that our books, records and accounts accurately and fairly reflect, in reasonable detail, our assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities. We require that:

- o   no entry be made in our books and records that intentionally hides or disguises the nature of any transaction or of any of our liabilities, or misclassifies any transactions as to accounts or accounting periods;

- o   transactions be supported by appropriate documentation;

- o   the terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in our books and records;

- o   employees comply with our system of internal controls; and

- o   no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund.

Our accounting records are also relied upon to produce reports for our management, shareholders and creditors, as well as for governmental agencies. In particular, we rely upon our accounting and other business and corporate records in preparing the periodic and current reports that we file with the SEC. These reports must provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations. Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosure is accurate and transparent and that our reports contain all of the information about Sarepta that would be important to enable shareholders and potential investors to assess the soundness and risks of our business and finances and the quality and integrity of our accounting and disclosures. In addition:

- o   no employee may take or authorize any action that would cause our financial records or financial disclosure to fail to comply with generally accepted

accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

o   all employees must cooperate fully with our Accounting Department, as well as our independent public accountants and counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that our books and records, as well as our reports filed with the SEC, are accurate and complete; and

o   no employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of our reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of our reports accurate in all material respects.

Any employee who becomes aware of any departure from these standards has a responsibility to report his or her knowledge promptly to a supervisor, the Corporate Responsibility Officer or one of the other compliance resources described in Section16.

## 9. Fair Dealing.

We strive to outperform our competition fairly and honestly. Advantages over our competitors are to be obtained through superior performance of our products and services, not through unethical or illegal business practices. Acquiring proprietary information from others through improper means, possessing trade secret information that was improperly obtained, or inducing improper disclosure of confidential information from past or present employees of other companies is prohibited, even if motivated by an intention to advance our interests. If information is obtained by mistake that may constitute a trade secret or other confidential information of another business, or if you have any questions about the legality of proposed information gathering, you must consult your supervisor or the Corporate Responsibility Officer, as further described in Section 16.

You are expected to deal fairly with our customers, suppliers, employees and anyone else with whom you have contact in the course of performing your job. No employee may take unfair advantage of anyone through misuse of confidential information, misrepresentation of material facts or any other unfair dealing practice.

Employees involved in procurement have a special responsibility to adhere to principles of fair competition in the purchase of products and services by selecting suppliers based exclusively on normal commercial considerations, such as quality, cost, availability, service and reputation, and not on the receipt of special favors.

45.     In violation of the Code of Ethics, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's internal controls over public reporting of the Individual Defendants' scheme to issue materially false and misleading statements to the public and their scheme to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.     In violation of the Code of Ethics, the Individual Defendants consciously disregarded their duties to (1) comply with the applicable laws and regulations, (2) protect corporate assets, (3) engage in fair dealing, (4) avoid using corporate opportunities for personal gain, (5) avoid conflicts of interest, (6) report violations of the Code of Ethics, (7) refrain from inappropriately using confidential information, (8) appropriately maintain the Company's books, records, accounts, and financial statements, and (9) make accurate filings with the SEC.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

46.     Sarepta is a biopharmaceutical company in the business of developing unique RNA-based therapeutics for the treatment of rare and infectious diseases.

47.     The Company specifically focuses on the treatment of DMD.  Sarepta is involved in or about to commence certain studies of its lead product candidate, eteplirsen, including  the following:  (i) an ongoing open label extension study following the completion of its initial Phase IIb clinical trials; (ii) several clinical trials in Exon 51 amenable genotypes, including a confirmatory study in ambulatory patients; (iii) studies on participants with early stage and advanced stage DMD and a placebo-controlled confirmatory study with one or more of the Company's follow-on DMD exon-skipping drug candidates; (iv) a Phase I/IIa clinical trial for an Exon 53 skipping product candidate in the European Union; and (v) an open investigational new

drug ("IND") application for its Exon 45 skipping product candidate with a clinical trial commencing early next year.

48.     DMD is a rare neuromuscular disorder that leads to progressive muscle loss, leading to severe disability and premature death.  It is caused by a genetic mutation that causes the dystrophin gene to produce inadequate amounts of dystrophin in the body.   Dystrophin is a protein that plays a key structural role in muscle fiber function and is needed to keep muscles intact.  The disorder occurs in approximately one of every 3,500 boys worldwide.[1]  Currently, there is no approved disease-modifying therapy for DMD.

49.     Sarepta's eteplirsen is one of two experimental drugs designed to treat DMD through the same methodology in clinical trials.  Sarepta's main competitor is Prosensa, recently acquired by BioMarin Pharmaceuticals ("BioMarin"), for $680 million. BioMarin's acquisition included the DMD drug product, drisapersen, like eteplirsen utilizes a near identical approach to treating DMD.  Drisapersen has also been in clinical trials and on a similar tract as Sarepta's eteplirsen for FDA approval in the United States and Europe, the untapped billion-dollar global DMD drug market.

50.     Both Sarepta and BioMarin are vying for "first-mover advantage," the competitive advantage gained by a company that markets the first drug to be successfully released in its market segment.  Often, the "first-mover" gains a competitive advantage because physicians will prescribe the first product to market for the treatment of their patients. After a

---

[1] DMD primarily affects boys and young men, and the symptoms typically begin to appear between the ages of one and four years old.  The main sign of DMD is muscle weakness that worsens over time.  Before age five, the muscles in the legs, arms, and trunk begin to weaken.  Affected children may experience developmental delays, which can include difficulty in walking, climbing stairs, or standing from a seated position.  Most children affected by DMD require full-time use of a wheelchair by the age of twelve.  Later in the disease's progression, the respiratory muscles weaken and require ventilation support.  Ultimately, the disorder impacts cardiac function, which can lead to heart failure.  DMD is universally fatal.

patient has begun a new treatment plan, it is unlikely for a physician to change the patient's medication mid-treatment since the process has begun that the patient has already adjusted to the first medication.

51.     Although both drugs could be sold simultaneously in the U.S., the second to reach market would be at a significant competitive disadvantage because the first to acquire U.S. marketing approval would have the "first-mover" advantage.  Sarepta's financial prospects were tied to the Company to have the first-mover advantage to have eteplirsen reach the market before drisapersen.

52.     This is not the first occasion whereby Sarepta has misrepresented its FDA communications.  On July 24, 2013, Sarepta announced to the public that the FDA was open to considering Sarepta's NDA based on the Company's submission of certain data on dystrophin and clinical outcomes from its existing eteplirsen studies.  Thereafter, Sarepta repeatedly touted this position.  For example, on August 8, 2013, Defendant Garabedian stated that the Company had "obtain[ed] feedback from the FDA that confirms our Phase II data set is sufficient for them to consider an NDA filing."

53.     However, on November 12, 2013, Sarepta announced that the FDA considered premature the Company's NDA filing.  The FDA subsequently disclosed to Sarepta in November 2013 that they previously expressed concern about the shortcomings in Sarepta's quantification methods.   In a turn-around, Defendant Garabedian communicated that the FDA was now reiterating their demand for additional studies, essentially conceding that the Company had previously heard these concerns from the FDA.

54.     Defendants Garabedian's and Mahatme's materially false or misleading statements from July 10, 2013 through November 11, 2013 led to the filing of class actions complaints for securities fraud.  *See Baradarian v. Sarepta Therapeutics, Inc., et al.*, Case No. 14-cv-10225-IT (filed January 29, 2014, D. Mass.); and *Corban v. Sarepta Therapeutics, Inc., et al.*, Case No. 14-cv-10201-IT (filed July 21, 2014, D. Mass.).   According to these complaints, Defendants Garabedian and Mahatme made materially false or misleading statements about the prospects of the FDA's acceptance for consideration of a NDA for eteplirsen to artificially inflate the price of Sarepta stock during a period when Sarepta was raising money in a stock offering, which offering was successfully completed just before the disclosure of the truth, which caused Sarepta's stock price to drop.

55.     Sarepta's misstatements in 2013 mirror the ones at issue here this action.  In each, the 2013 and 2014 federal securities fraud actions, Defendants selectively cited communications from the FDA and represented them in a way that was more favorable to the Company. Similarly, in both cases, once the truth was revealed, Defendants claimed that the FDA had changed their position, while the FDA insisted otherwise.  In both instances, the Company failed to make the FDA's statements fully available to the public.  If the FDA had not changed its position, then the full transcripts would have exonerated the Company and its executives.

56.     However, to date, the Company has never released the entirety of these communications to the public.

57.     On January 9, 2014, the Company announced that it had hired Arthur Krieg, M.D. ("Krieg") to be Senior Vice President, Chief Scientific Officer ("CSO").   The Company

announced that Krieg would lead the Company's drug discovery and early-stage research activities.

58.     Krieg was intimately involved in the Company's dystrophin analysis for clinical studies and submissions to the FDA.  Defendants confirmed this on May 8, 2014 during a conference call with analysts and hosted by Defendant Kaye.  In relevant part, Defendant Kaye stated:  "[W]e've really been spending the last nine months trying to make sure that we have optimized every aspect of the dystrophin analysis.  And especially with Art Krieg coming on board, he's been helping us.  We've been working with all of really the key opinion leaders in the world looking at this."  Defendant Kaye continued, "And also remember, we've had several discussions with the FDA and they will look at our protocol and make sure that they agree. But I think at this point, this is going to be the state-of-the-art for dystrophin analysis by the time the study rolls out."

59.     As discussed above, one method for determining the progression or regression of DMD is through the determination of the amount of dystrophin in the muscle tissue.  Doctors and scientists perform muscle biopsies for dystrophin studies to look for abnormal levels of dystrophin in the muscle. The dystrophin protein can be visualized by staining the muscle sample with a special dye that allows you to see the dystrophin protein.  This method requires viewing and analyzing slides, and is inherently subjective.

60.     Sarepta's dystrophin analysis was all conducted at a single location:  Nationwide Children's Hospital in Columbus, Ohio.  This clinical review was entirely overseen by Dr. Jerry R. Mendell, M.D.  Throughout the Relevant Period, the FDA has been in possession of all of Sarepta's dystrophin data.

61.     On April 21, 2014, Sarepta issued a press release entitled, "Sarepta Therapeutics Announces Plans to Submit New Drug Application to FDA for Eteplirsen for the Treatment of Duchenne Muscular Dystrophy by Year End 2014."  The press release stated, in pertinent part:

*- FDA provides updated guidance on potential early approval pathway for eteplirsen;*

*- Agreement reached with the Agency on eteplirsen open-label confirmatory studies with enrollment of a broader base of DMD patients later this year;*

*- FDA provides initial guidance on development follow-on DMD drug candidates;*

*****

Sarepta Therapeutics, Inc. [ ], a developer of innovative RNA-based therapeutics, today announced it plans to submit a New Drug Application (NDA) to the U.S. Food and Drug Administration (FDA) by the end of 2014 for the approval of eteplirsen for the treatment of Duchenne muscular dystrophy (DMD).  Eteplirsen is Sarepta's lead exon-skipping drug candidate in development for the treatment of patients with DMD who have a genotype amenable to skipping of exon 51.

The plan to submit an NDA for eteplirsen by the end of 2014 is based on a guidance letter from the Agency that proposed a strategy regarding the submission of an NDA for eteplirsen under a potential Accelerated Approval pathway and served as the final meeting minutes for four meetings that took place between November, 2013 and March, 2014.  The Agency stated that "with additional data to support the efficacy and safety of eteplirsen for the treatment of DMD, an NDA should be fileable," and outlined examples of additional data and analysis that, if positive, will be important to enhance the acceptability of an NDA filing by addressing areas of ongoing concern in the existing dataset.  Additionally, the Agency provided clear guidance on an open-label, historically controlled confirmatory study of eteplirsen, as well as initial guidance on a placebo-controlled study of one or more follow-on DMD drug candidates, which, like the open-label study, could also be considered an acceptable confirmatory study to verify the clinical benefit of eteplirsen in the event of an accelerated approval.

62.     Defendant Garabedian was quoted in the press release as follows: "As we announce our plan to submit an eteplirsen NDA by the end of 2014, we are very pleased with the detailed guidance that the FDA has provided us on a potential eteplirsen approval pathway and their support of a historically controlled eteplirsen confirmatory study ... We also appreciate that

the FDA shares our urgency in dosing a broader base of eteplirsen patients and has encouraged

us to begin the clinical program with our follow-on exon-skipping drugs as soon as possible."

63.     The press release described Sarepta's plans as follows:

Based on the Agency's guidance, Sarepta plans to initiate several additional clinical
studies with eteplirsen later this year in exon-51 amenable genotypes.  These studies will
include a clinical trial with predefined efficacy endpoints for ambulatory patients
between the ages of 7 to 16 years who can walk a minimum distance, and two additional
clinical trials that will evaluate safety and biomarkers in DMD patients younger than 7
years and DMD patients who have advanced in their disease progression to a point
[where] they cannot walk a minimum distance or have become non-ambulant.
Additionally, Sarepta plans to initiate a placebo-controlled study with one or more of its
follow-on DMD exon-skipping drug candidates by the end of the year.

64.     Sarepta's CMO, Defendant Kaye, stated,

We are excited to have guidance from the FDA that allows us to move quickly into
additional clinical trials with eteplirsen to confirm our current understanding of
eteplirsen's safety profile, its effect on dystrophin production, and its impact on clinical
outcomes in DMD patients. . . .  We are particularly pleased that the FDA shares our
interest in accelerating the clinical development of our follow-on exon-skipping drugs
and we expect to initiate enrollment in this trial later this year.

65.     The press release reported that the Company would immediately commence

additional eteplirsen clinical studies to begin dosing in the confirmatory study in the third quarter

and dosing in the additional trials (i.e., younger and more advanced DMD patients) to begin later

this year.

66.     Excerpts from the FDA's guidance letter are as follows:

[W]ith additional data to support the efficacy and safety of eteplirsen for the treatment of
DMD, described below, an NDA should be fileable (assuming other aspects of the
submitted application meet applicable standards).  As we are sure you appreciate,
however, our willingness to consider an application for filing cannot be taken to suggest
the outcome of our review.  We also note that if the application is filed, you should
expect public discussion of the NDA at an Advisory Committee meeting.

67.     The FDA outlined two potential pathways to accelerated approval:

1.      The clinical data from Study 201/202 [Phase lib clinical trial program] on 6-minute walk could be considered a finding on an intermediate clinical endpoint that could have the potential to support accelerated approval.[2]

 2.      We have discussed the possibility of using a number of modalities to quantify dystrophin in muscle biopsies, and discussed how these biomarkers might be used as a surrogate endpoint(s) to support accelerated approval.

68.      Evaluating this pathway, the FDA expressed concerns about methodological problems in the assessments of dystrophin, the FDA "remain[ed] skeptical about the persuasiveness of the (dystrophin) data," and, as a result, the FDA was "uncertain whether the existing dystrophin biomarker data will be persuasive enough to serve as a surrogate end point that is reasonably likely to predict clinical benefit."  However, the FDA further stated that if they "were to find the biomarker data to be adequate upon detailed review, [ ] they would have the potential to support accelerated approval."  To that end, the FDA proposed "a collaborative effort in which we will work to better understand the methods and analyses used for the existing biomarker data," and "also work together on methods for the collection of additional data that could be more reliable."

69.      The FDA suggested another approach to demonstrating the effect of eteplirsen on dystrophin protein production that might attain accelerated approval -- to obtain a fourth muscle biopsy in patients continuing in Study 202:

> Under either potential application of the Accelerated Approval pathway, the FDA's letter included comments expressing both a desire for more eteplirsen safety and efficacy data and a willingness to consider supplemental data in an NDA filing or during an NDA review (following the NDA filing) from the ongoing Study 202 and early safety and biomarker data from a confirmatory eteplirsen study.  The Agency also encouraged Sarepta to collect safety and biomarker data with eteplirsen in a broader population of

[2] Related to this first pathway to Accelerated Approval, the FDA stated that they have "significant concerns regarding our ability to draw valid conclusions based on the Study 201/202 data with respect to walking performance and other data," and identified areas relating to the interpretation of the existing data set that would be addressed as part of an NDA review once the NDA is filed.

patients, including DMD patients who were younger, older and non-ambulant, and previously treated with drisapersen.

70.     Some additional excerpts from the FDA's letter on the eteplirsen and follow-on

exon-skipping drug confirmatory studies are set forth below:

"[A]ny accelerated approval [of eteplirsen} would necessitate confirmatory studies to verify the clinical benefit. Confirmatory studies should be underway at the time of approval."

The FDA outlined two approaches for confirmatory trials and urged Sarepta to initiate both of these trials as soon as possible.

1.     A historically-controlled trial might be acceptable to confirm clinical benefit following accelerated approval.

2.     A randomized, placebo-controlled trial of another PMO [phosphorodiamidate morpho/ina oligomer] with a similar mechanism of action, directed at a different exon [ ] with a demonstration of a correlation between dystrophin production and definitive clinical benefit on 6-minute walk or another measure, could provide confirmatory evidence of eteplirsen's clinical benefit if approval were based on a surrogate endpoint.

(Internal quotations omitted).

71.     On this news, Sarepta's stock price closed at $33.98, up from $24.40 on April 20,

2014, the day before.  The next day, on April 22, 2014, the Company issued a press release, titled

"Sarepta Therapeutics Announces Proposed Public Offering of Common Stock."  Therein, the

Company disclosed that Sarepta was offering to sell up to $100 million of its common stock in

an underwritten public offering and that it intends to grant the underwriters of the offering a 30-

day option to purchase from it up to an additional $15 million of shares.

72.     On April 23 and 24, 2014, the Company respectively filed with the SEC, a

preliminary and supplementary prospectus on Form 424B5 for a public offering of 2,650,000

shares of Sarepta common stock at $38.00 per share.  On April 29, 2014, the Company sold the

2,650,000 shares at $38.00 per share resulting in net proceeds (after deducting underwriting

discounts, commissions and other estimated offering expenses) to the Company of approximately $94.5 million.

73.     Throughout the Relevant Period, Sarepta repeatedly asserted that the Company's dystrophin data would be sufficient for the filing of the NDA (*see* statements at ¶¶ 60-64, above). These assertions were materially false and/or misleading when made because the Individual Defendants failed to disclose that: (1) Sarepta failed to provide sufficient data for its NDA submission of eteplirsen; (2) as a result, the Company's NDA for eteplirsen would likely be filed in mid-2015 instead of by the end of 2014; and therefore, (3) the Company's statements about its business, operations, and projections, including statements about eteplirsen's prospects for FDA approval, were materially false and misleading and/or lacked a reasonable basis.

74.     On May 8, 2014, the Company issued a press release for the first quarter and quarterly period ending March 31, 2014, "Sarepta Therapeutics Announces First Quarter 2014 Financial Results and Recent Corporate Developments."  The press release stated:

New Drug Application for eteplirsen planned for submission to FDA by year end[;]

Multiple eteplirsen clinical studies in broader population of DMD patients to begin dosing later this year[;]

Investigational New Drug applications for two additional DMD drug candidates targeting different genetic subpopulations to be submitted to FDA in third quarter; [and]

Well capitalized with $233.1 million in cash and other investments at quarter end, with an additional $94.5 million raised post-quarter end.

75.     Defendant Garabedian reported in the press release, "The path toward an NDA filing and a potential accelerated approval of eteplirsen has been laid out for us and we are busy preparing for the important clinical and regulatory milestones toward achieving this goal... We are also preparing to advance our broader DMD program beyond eteplirsen in the U.S., and will

begin the global clinical development program on our next exon-skipping drugs, as well as seek

EMA guidance on requirements for a potential eteplirsen submission in the EU, later this year."

76.     The press release set forth the quarterly financial results as follows:

For the first quarter of 2014, Sarepta reported a non-GAAP net loss of $20.7 million, or $0.55 per share, compared to a non-GAAP net loss of $13.0 million for the first quarter of 2013, or $0.41 per share.  The incremental loss is primarily the result of an increase of $9.1 million in non-GAAP operating expenses due to corporate growth, offset by an increase of $1.6 million in contract revenue.

On a GAAP basis, the net loss for the first quarter of 2014 was $28.3 million, or $0.75 per share (including $4.4 million of stock-based compensation and restructuring expenses), compared with a net loss of $42.1 million for the first quarter of 2013, or $1.32 per share (including $2.1 million of stock-based compensation and restructuring expenses). The decrease in net loss is primarily due to a decrease of $23.7 million in loss on change in warrant valuation and an increase of $1.6 million in contract revenue offset by an increase of $11.3 million in operating expenses.  The fluctuation in the fair value of the Company's outstanding warrant liability is primarily affected by the fluctuation of the Company's stock price during each financial reporting period.

Revenue for the first quarter of 2014 was $6.1 million, up from $4.5 million for the first quarter of 2013.  The $1.6 million increase was primarily due to the timing of activities in connection with the Marburg portion of the July 2010 U.S. government contract. Revenue from the Company's European Union SKIP-NMD agreement supporting development of an exon 53 skipping therapeutic and the Company's Children's National Medical Center agreement also increased in the first quarter of 2014.  These increases were partially offset by a decrease in revenue from the August 2012 intramuscular agreement with the U.S. government, which was completed in the third quarter of 2013. . . .

The increased operating expenses were primarily caused by corporate growth as the Company continues the development of its programs in Duchenne muscular dystrophy (DMD).

77.     In connection with Sarepta's DMD program, the Company underscored its

intention to submit its NDA to the FDA with the requested additional safety and efficacy data

and analysis by year's end for the approval of eteplirsen for treatment of DMD patients with a

genotype amenable to skipping of exon 51.  Sarepta also reaffirmed its plans to commence

clinical trials of eteplirsen based on the FDA's new guidance:

Planned studies with eteplirsen in exon-51 amenable genotypes include a historically controlled clinical trial with predefined efficacy endpoints for ambulatory patients between the ages of 7 to 16 years who can walk a minimum distance, and two additional clinical trials that will evaluate safety and biomarkers in DMD patients younger than 7 years and DMD patients who have advanced in their disease progression to a point where they cannot walk a minimum distance or have become non-ambulant.

78.     The Company also announced plans to initiate a placebo-controlled study with one or more of Sarepta's other follow-on DMD exon-skipping drug candidates by year's end. Sarepta further reported that it presented "clinical data through Week 120 from Phase IIb open-label extension study of eteplirsen in patients with DMD" at the Muscular Dystrophy Association Clinical Conference and the American Academy of Neurology Annual Meeting.

79.     In connection with its public offering, the Company reported on its underwritten public offering of an aggregate of 2,650,000 shares of common stock to the public of $38.00 per share.

In addition, Sarepta has granted the underwriters a 30-day option to purchase up to an additional 397,500 shares of common stock on the same terms and conditions as the initial shares sold to the underwriters. The aggregate net proceeds from the offering to the company was approximately $94.5 million, after deducting the underwriting discount and estimated offering expenses payable by Sarepta, but excluding any exercise of the underwriters' option.  The offering closed on April 29, 2014.

80.     On May 8, 2014, Sarepta filed with the SEC a Form 10-Q for the quarterly period ended March 31, 2014 containing the same information set forth in the press release.  Defendants Garabedian and Mahatme signed the Form 10-Q and attested to the accuracy of the Form 10-Q pursuant to Rules 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX").

81.     The statements contained in ¶¶ 74-78 and ¶ 80 above were materially false and/or misleading when made because the Individual Defendants failed to disclose that: (1) Sarepta

failed to provide sufficient data for its NDA submission of eteplirsen; (2) the Company's NDA

for eteplirsen would likely be filed in mid-2015, not by the end of 2014; and therefore, (3) the

Company's statements about its business, operations, and projections, including statements about

eteplirsen's prospects for FDA approval, were materially false and misleading and/or lacked a

reasonable basis.

82.     On May 13, 2014, Defendant Garabedian stated that "once the FDA meets this

team and understands exactly how it was done, they will have the same confidence we have in

our existing dystrophin data set."

83.     In May 2014, the FDA visited National Children's Hospital and reviewed the trial

site and protocols.

84.     On July 10, 2014, the Company issued a press release titled, "Sarepta

Therapeutics Reports Long-Term Outcomes Through 144 Weeks from Phase IIb Study of

Eteplirsen in Duchenne Muscular Dystrophy."  The press release stated, in pertinent part:

> Sarepta Therapeutics, Inc. [ ], a developer of innovative RNA-based therapeutics, today
> announced data through Week 144 from Study 202, a Phase IIb open-label extension
> study of eteplirsen in patients with Duchenne muscular dystrophy (DMD).  After nearly
> three years of follow up, results on the 6-minute walk test (6MWT) showed a decline in
> walking ability at a rate slower than would be expected based on available DMD natural
> history data.  In addition, a continued stabilization of respiratory muscle function was
> observed, as assessed by pulmonary function tests.  As previously reported, Study 202
> met its primary endpoint of increased novel dystrophin as assessed by muscle biopsy at
> Week 48 and is now in the long-term extension phase in which patients continue to be
> followed for safety and clinical outcomes.
>
> At Week 144, patients in the 30 mg/kg and 50 mg/kg eteplirsen cohorts who were able to
> perform the 6MWT (modified Intent-to-Treat or miTT population; n=6) experienced a
> decline of 33.2 meters, or about 8.5 percent, from baseline in walking ability.  A
> statistically significant treatment benefit of 75.1 meters ($p \leq S0.004$) was observed for the
> miTT population compared with the placebo/delayed-treatment cohort (n=4), which
> initiated treatment at Week 25 following 24 weeks of placebo. After experiencing a
> substantial decline of 68.4 meters from baseline to Week 36, the placebo/delayed-

treatment cohort demonstrated a decline of 39.0 meters in walking ability from Week 36 through Week 144, the period from which meaningful levels of dystrophin were likely produced. These analyses were based on the maximum 6MWT score when the test was performed on two consecutive days.

"The long-term clinical data for eteplirsen showing a slowing in the decline of walking ability in a population now on average 12 years old are very encouraging, particularly when compared with the growing body of DMD natural history data which clearly show that similarly aged patients typically experience an increasingly rapid decline in walking ability and lose ambulation in their early teen years," said Jerry Mendell, M.D., director of the Centers for Gene Therapy and Muscular Dystrophy at Nationwide Children's Hospital and principal investigator of the Phase lib study. . . .

Through 144 weeks, eteplirsen was well tolerated and there were no reported clinically significant treatment-related adverse events and no treatment-related serious adverse events.  In addition, there were no treatment-related hospitalizations or discontinuations.

85.     Defendant Kaye  was quoted in the press release as stating, "We are encouraged to see continued stability on measures of respiratory muscle function in patients treated with eteplirsen for nearly three years, particularly as declines in MIP and MEP are often the first signs of pulmonary dysfunction in DMD."  Defendant Kaye continued, "As we prepare to submit a New Drug Application for eteplirsen including these data, we are also on track to initiate in the coming months several new clinical studies of eteplirsen in a broader patient population to further characterize the drug's safety and efficacy profile."

86.     In the press release, Defendant Garabedian reaffirmed that "[w]e now have nearly three years of treatment experience with eteplirsen from our Phase IIb clinical study program and, based on guidance from the U.S. Food and Drug Administration earlier this year, we plan to submit these results along with additional data and analysis as part of a New Drug Application for eteplirsen by year-end."

87.     However, in July 2014, Defendants received from the FDA a request for reassessment of its primary dystrophin endpoint by independent pathologists at independent labs. The FDA clearly needed additional, independent clinicians to review the Sarepta-provided data.

88.     On July 24, 2014, *The Wall Street Journal* published an article titled "Chief Scientist Out at Sarepta Therapeutics; Managerial Turnover Hits Biotech as It Seeks Approval for Drug to Treat Rare Form of Muscular Dystrophy." The article explained, in part, as follows:

> On Thursday, Sarepta disclosed in a regulatory filing that it had fired its chief scientific officer, Arthur Krieg. People familiar with the matter said he was fired after raising concerns with members of Sarepta's board about Chief Executive Chris Garabedian's management of the company. As a top executive in charge of early-stage research and development, Dr. Krieg had been heavily involved in helping prepare preclinical data for submission to the FDA in support of approval for eteplirsen, Sarepta's leading drug candidate. These people didn't specify the concerns that Dr. Krieg brought to the board.
>
> Cambridge, Mass.-based Sarepta said in the filing that Dr. Krieg had been "terminated from his position," without providing further detail. "I had serious disagreements with the CEO," Dr. Krieg said when reached by telephone. "That's all I can say until I speak with my attorney." Dr. Krieg's termination, the latest of several departures involving senior employees over the past year, comes at a critical juncture for a biotech that has no approved products. Eteplirsen has shown promising results in small mid-stage studies of patients with Duchenne muscular dystrophy, an inherited genetic disease affecting mostly young boys and resulting in a life expectancy of around 30 years. There are currently no effective treatments for Duchenne, and some patient advocates have aggressively lobbied the FDA to approve the treatment.

89.     On July 29, 2014, *The Wall Street Journal* published another article, which was titled "Sarepta CEO Gives Up Some of His Broad Sway Over Management; Chris Garabedian's Participation in Talks With FDA Over Eteplirsen Clearance to Be Limited." The article reported:

> Sarepta Therapeutics Inc., which is seeking U.S. regulatory approval for a drug to treat a rare childhood disease, recently moved to limit Chief Executive Chris Garabedian's broad sway over operations, especially his role in discussions with the Food and Drug Administration.

The step was taken in response to the concerns of some company executives who worried Mr. Garabedian's involvement in the regulatory discussions was counterproductive, according to people familiar with the matter.  Mr. Garabedian previously had unusually wide latitude in decision-making at the company, and the new limits on some of his responsibilities will make Sarepta more closely resemble other biotech companies of its size and maturity, a person familiar with the matter said. . . .

But Mr. Garabedian's management style has also become a point of contention among some executives and is blamed by some for a spate of employee departures, according to people familiar with the matter.

Sarepta Chairman William Goolsbee said at a July meeting of the company's executive team that Mr. Garabedian would no longer attend the biotechnology company's meetings with the FDA, according to two people familiar with the matter. Mr. Goolsbee didn't respond to requests for comment.

Some employees at the company had become concerned Mr. Garabedian's presence at previous FDA meetings, in which he forcefully defended Sarepta's view that its lead drug eteplirsen should be approved before the completion of a late-stage study, had been counterproductive and alienated regulators, according to the people familiar with the matter.

In addition, Mr. Goolsbee said Mr. Garabedian, who was also present at the July management meeting, wouldn't have final say in decisions about clinical trial design and patient safety, the people familiar with the matter said.

A Sarepta spokesman confirmed Mr. Goolsbee said during the meeting that Mr. Garabedian's role in some regulatory and medical affairs would be limited, but declined to comment on specific concerns related to Mr. Garabedian's management style.

The spokesman also confirmed Mr. Goolsbee's comments at the meeting came after a large shareholder, Richard Barry, and former Chief Scientific Officer Arthur Krieg, separately raised concerns with the board about Mr. Garabedian's management of the company. . . .

Sarepta officials have met with the FDA multiple times to discuss the clinical evidence the agency would need to consider accelerated approval of the drug.  Mr. Garabedian often attended those meetings, which is unusual for a CEO, and was at times confrontational with agency officials, according to people familiar with the matter.

One person familiar with the matter, however, said Mr. Garabedian had been an asset at the meetings.   "At times when the FDA comes aggressively at us with wrong interpretations of the data, he's there with data at his fingertips to set the record straight," this person said.

Mr. Garabedian's role at the FDA meetings was among the concerns Dr. Krieg, who was fired last week after joining the company in January, raised with members of Sarepta's board of directors in recent months, according to a person familiar with the matter.

Without providing further detail, Cambridge, Mass.-based Sarepta said in a filing last week that Dr. Krieg had been terminated from his position. "I had serious disagreements with the CEO," Dr. Krieg said when reached by telephone at the time.

90.     On August 1, 2014, *Fierce Biotech* published an article titled "Sarepta Looks to Quiet Controversy with a Boardroom Shakeup." The article reported:

After a behind-the-scenes squabble spilled out into the public, Sarepta [ ] has replaced the chairman of its board and reaffirmed its support of CEO Chris Garabedian, looking to move on from an embarrassing distraction and focus on its lead drug program.

Chairman William Goolsbee has resigned from the top spot, Sarepta said, retaining a position on the board but ceding chairmanship to fellow member John Hodgman, the current CFO of InterMune [ ], who will lead on an interim basis.

The move appears to be a victory for Garabedian, who, according to a Wall Street Journal report, had clashed with Goolsbee over just how much say the CEO should have in Sarepta's day-to-day business -- particularly in the development of eteplirsen, an in-development treatment for Duchenne muscular dystrophy (DMD) for which the company hopes to win an accelerated FDA approval.

According to the *Journal*, after repeated complaints to the board, Goolsbee moved to limit Garabedian's influence on the regulatory process, telling the company's leadership that he would no longer be present in meetings with the FDA. Sarepta declined to comment on that story but noted that it wasn't asking for any corrections.

Now, with Goolsbee stepping down, it would appear Garabedian is free to get back to business as usual. Among the privileges previously revoked was final say in matters of trial design, according to the *Journal*'s sources, and Hodgman used the occasion of his promotion to say the CEO is back to full control.

91.     On August 7, 2014, Sarepta issued a press release announcing the financial results for the second quarter 2014 for the quarterly period ending June 30, 2014. The Company reported:

Progress achieved across eteplirsen clinical studies with patient screening expected to begin this month[;]

On track to submit New Drug Application for eteplirsen by year-end[;]

Follow-on exon-skipping drugs targeting exons 45 and 53 advancing toward clinical testing; [and]

Well capitalized with $284.2 million in cash and other investments at quarter end[.]

92.     Defendant Garabedian, in the press release, touted the results, as follows:  "We've made tremendous progress in advancing our eteplirsen clinical trials and are ready to begin our confirmatory ambulatory study this month, the first of three new studies with eteplirsen... We continue to work on preparing our NDA submissions, while making progress on both our additional studies with eteplirsen and studies with follow-on exon-skipping drug candidates for Duchenne muscular dystrophy patients with other genotypes."

93.     The press release set forth the following with respect to 2014 Guidance:

The Company now expects that Non-GAAP loss from operations will range from $135 to $145 million, as compared with its previous guidance of $110 to $120 million.   In addition, The Company is anticipating capital investments of approximately $25 million for the remainder of 2014 in connection with its manufacturing facility in Andover and 2015 inventory commitments.  The Company is not able to provide a reconciliation of this Non-GAAP guidance to its relevant GAAP measure because full year loss from operations could include incremental stock compensation expense related to the achievement of certain criteria for performance awards. . . .

Duchenne Muscular Dystrophy Program

-- Announced updated data from Study 202, a Phase IIb open-label extension study of eteplirsen in patients with DMD.  Results on the 6-minute walk test (6MWT) at 144 weeks showed a decline in walking ability at a rate slower than would be expected based on available DMD natural history data.   In addition, a continued stabilization of respiratory muscle function was observed.  As previously reported, Study 202 met its primary endpoint of increased novel dystrophin as assessed by muscle biopsy at week 48 and is now in the long-term extension phase in which patients continue to be followed for safety and clinical outcomes.

Corporate Updates

-- Acquisition of the multifunctional manufacturing facility on 26 acres of land in Andover, Massachusetts supports large-scale manufacturing needs.

-- John Hodgman was named interim chairman of the board of directors.

94.     On August 7, 2014, Sarepta filed its Quarterly Report with the SEC on Form 10-Q for the quarter ended June 30, 2014 containing similar information as that set forth in the press release.   Defendants Garabedian and Mahatme signed the Form 10-Q and attested to the accuracy of the Form 10-Q pursuant to SOX.

95.     The statements contained in ¶¶ 91 to 94, above, were materially false and/or misleading when made because the Individual Defendants failed to disclose that: (1) Sarepta failed to provide sufficient data for its NDA submission of eteplirsen; (2) the Company's NDA for eteplirsen would likely be filed in mid-2015, not by the end of 2014; and therefore, (3) the Company's statements about its business, operations, and projections, including statements about eteplirsen's prospects for FDA approval, were materially false and misleading and/or lacked a reasonable basis.

96.     On October 27, 2014, the Company issued a press release, "Sarepta Therapeutics Announces Regulatory Update on Eteplirsen."   The Company announced that the NDA submissions for eteplirsen was pushed back to mid-year 2015 based on updated and additional guidance received from the FDA, stating, in pertinent part:

> Sarepta Therapeutics, Inc. [ ], a developer of innovative RNA-based therapeutics, today provided an update on its discussions with the U.S. Food and Drug Administration (FDA) regarding its planned New Drug Application (NDA) submission for the approval of eteplirsen for the treatment of Duchenne muscular dystrophy (DMD).
>
> In meeting minutes received last week from a Type B Pre-NDA meeting that took place in September 2014, the FDA provided updated guidance regarding the specific data to be included as part of, or at the time of, Sarepta's NDA submission.  The guidance states that additional data are now required as part of the NDA submission, including the results from an independent assessment of dystrophin images and the 168-week clinical data

from study 202.  Additionally, the guidance requests more specific data including a minimum duration of safety in new patients exposed to eteplirsen, patient-level natural history data to be obtained by Sarepta from independent academic institutions, and MRI data from a recent study conducted by an independent academic group.  The FDA indicated that further discussion with Sarepta "will be necessary to determine what would constitute a complete NDA."  Based on these requests, Sarepta plans to submit an NDA by mid-year 2015, pending any additional requests from further discussions with the FDA.

97.    Defendant Garabedian insisted in the press release that "[w]e are committed to satisfying the FDA's updated requests for these specific data to be included as part of an NDA submission and will continue to work with the Agency toward the goal of a complete and acceptable NDA filing... We believe all of the data requests and additional FDA discussions that have currently been outlined can be completed in time for an NDA submission by mid-year 2015.  Obtaining an FDA approval of eteplirsen for the DMD patients who may benefit from the drug continues to be our highest priority."

98.    According to the Pre-NDA Meeting Minutes highlighted in the press release, the FDA wanted the following information incorporated into the NDA for eteplirsen:

The sponsor should include 3-month data from at least 12 to 24 newly exposed patients at the time the NDA is submitted.

Available data from the other patients enrolled in the new eteplirsen studies (studies 301, 203, 204) should also be included at the time the NDA is submitted, even if exposure is less than 3 months in duration.

Additional data from later time points and from newly enrolled patients should be submitted in the 120-Day Safety Update.

FDA strongly advises the sponsor to obtain and submit patient-level natural history data. FDA is prepared to appeal to the academic groups holding the data to allow the sponsor a means to acquire the data.

The study 201/202 clinical site inspection conducted in May, 2014, after the issuance of the April 15, 2014, guidance letter, uncovered marked disparities in the immunohistochemistry methodology and concerns about the reproducibility of the data. The lack of confirmation of robust dystrophin measurement during the site visit

necessitates including the independent assessment of dystrophin-positive fibers and 168-week efficacy data from study 201/202 in the NDA.

FDA strongly urged the sponsor to submit the MRI data with appropriate natural history controls.

99.      The FDA also advised that "[a]dditional discussion between the sponsor and the FDA will be necessary to determine what would constitute a complete NDA."

100.     In a conference call with analysts, Sarepta's CMO, Defendant Kaye, confirmed the FDA's concerns that all of Sarepta's testing occurred at a single site, and the data was not "robust" enough, stating, in pertinent part:

> [S]o I think one of the issues, of course, I think has been a concern raised by the FDA is just that it's been a single site. So in order to increase the robustness of the data, it's having more than one pathologist, and in this case three pathologists will reread it in a blinded fashion and can have a similar reading.  So this is not unusual for the FDA to request this. Often in other studies, you have more than one individual reading the results just to make sure that you can confirm it and that it's consistent.

101.     Following this announcement, Sarepta shares fell to a close on October 27, 2014 of $15.91 per share, down from $23.56 per share at closing on the previous business day.

102.     On October 30, 2014, the FDA confirmed that it had consistently represented to Sarepta that additional information would be necessary before an eteplirsen NDA could be fileable.  In its "Duchenne Muscular Dystrophy Statement," the FDA undertook the unusual step of publicly addressing each of the statements contained in the Company's October 27, 2014 press release, stating as follows:

> On October 27, 2014, Sarepta Therapeutics released a statement and had a conference call regarding guidance received from FDA in a September 2014 meeting regarding its planned New Drug Application (NDA) for eteplirsen, to treat patients with DMD.  To the extent allowed by laws restricting release of confidential information about experimental drugs, FDA is addressing questions the agency has received from DMD patients, their families, and others in the community who are concerned about the timing of the filing of an NDA for eteplirsen.

- 40 -

Over the past several years, FDA has worked extensively with Sarepta on the development of eteplirsen, and provided guidance with respect to the data that would be necessary to determine whether it is effective and support filing of an NDA. Following a meeting with FDA last April, Sarepta announced on April 21, 2014, that with additional data to support the efficacy and safety of eteplirsen for the treatment of DMD, an NDA should be fileable. Sarepta also announced at that time that FDA had communicated that there were areas of concern in the existing database, and that FDA had provided Sarepta with examples of additional data and analyses that, if positive, would be important to enhance the acceptability of an NDA filing…. Sarepta announced at the time its plans to submit an NDA for eteplirsen by the end of 2014.

Since the April 2014 meeting, FDA has been working intensively to help Sarepta provide the additional data and analyses needed to support an NDA. FDA understands the considerable disappointment in the Duchenne community following Sarepta's October 27 announcement that the previous time frame for submitting the NDA for eteplirsen cannot be met.

In its advice to Sarepta, FDA has consistently stated that it would be necessary to include data in its NDA demonstrating that eteplirsen increases production of the muscle protein dystrophin. (Eteplirsen's proposed mechanism of action is through increasing production of this muscle protein.) As described by Sarepta in its October 27 statement, the need for additional data and analyses to support the NDA was reinforced by an FDA inspection of the clinical site where dystrophin analyses had been conducted. It is important to note that the agency did not find any evidence of fraud at this site, as has been perceived by some. FDA is concerned that the methods used to measure dystrophin were not adequately robust to support an NDA submission. Thus, FDA provided Sarepta with detailed recommendations on how to improve these dystrophin analyses, and FDA's most recent advice was consistent with the advice provided after the April 2014 meeting.

FDA has also been consistent in its guidance to Sarepta that it would be necessary to submit data from the ongoing open-label trial of eteplirsen (Study 202) in an NDA, along with data from natural history studies that could show that patients treated with eteplirsen experienced slower decline in physical function. FDA has worked closely with Sarepta in efforts to obtain these natural history data from investigators.

FDA has consistently advised Sarepta that data from additional patients, beyond the patients included in Study 202, would be critical to our assessment of the safety and efficacy of eteplirsen. In our April 2014 letter to Sarepta, FDA strongly encouraged Sarepta to begin enrollment of new patients as soon as possible.

FDA has expressed willingness to conduct a rolling review of Sarepta's NDA. Under a rolling review, companies can submit, and FDA can review, portions of an application as they are completed. Once submission of all components is complete, the review clock begins. FDA expects the NDA for eteplirsen will qualify for a priority review.

(Internal quotations omitted.)

103.   On March 31, 2015, Defendant Garabedian abruptly resigned, and Defendant Kaye became the Company's interim CEO.   According to an article on *TheStreet.com* titled "Sudden Exit of Sarepta CEO Fuels Speculation That Soured FDA Relationship Is to Blame," Defendant Garabedian was not "well-liked on the Street."   The article reported that "[i]t's believed the FDA isn't a fan of Garabedian because of critical (some might say antagonistic comments he's made in the past about the way regulators are handling the approval process for eteplirsen . . . ."

104.   Then Sarepta Chairman, Defendant Hodgman remarked about the Company's change in leadership:   "We believe this change will facilitate the company's clinical and regulatory discussions and relationships with the goal of meeting its stated timelines for bringing a potentially disease-modifying treatment to patients with DMD as soon as possible."

105.   Thus, the Individual Defendants' caused the Company to issue misleading statements and omissions of material fact about the progress toward eteplirsen approval, which caused Sarepta's stock to be traded at artificially inflated levels during the Relevant Period. When the true revelations about eteplirsen NDA status permeated the market, Sarepta's shares sharply declined, damaging the Company.

## DAMAGES TO SAREPTA

106.   As a direct and proximate result of the Individual Defendants' conduct, Sarepta will lose and expend many millions of dollars.

107.   Such expenditures include, but are not limited to, legal fees associated with the securities fraud class actions filed against the Company and Defendants Garabedian, Mahatme and Kaye, and amounts paid to outside lawyers, accountants, and investigators in connection

thereto, and losses of revenues caused by customers' loss of trust in the Company's business and products.

108.    Such costs include those incurred from the loss of Sarepta's customers' confidence in Sarepta.

109.    Such costs also include, but are not limited to, compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

110.    As a direct and proximate result of the Individual Defendants' conduct, Sarepta has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

111.    Plaintiff brings this action derivatively and for the benefit of Sarepta to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Sarepta and unjust enrichment, other misconduct, as well as the aiding and abetting thereof.

112.    Sarepta is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

113.    Plaintiff is, and at all relevant times has been, a Sarepta shareholder.  Plaintiff will adequately and fairly represent the interests of Sarepta in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

114.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

115.    A pre-suit demand on the Board of Sarepta is futile and, therefore, excused.  At the time of filing of this action, the Board consists of four Defendants -- Behrens, Goolsbee, Price, and Wigzell (collectively, the "Director-Defendants") -- and three newer appointees to the Board -- Richard J. Barry ("Barry"), Jean-Paul Kress ("Kress") and Claude Nicaise ("Nicaise"). Plaintiff only needs to allege demand futility as to four of the seven Directors that are on the Board at the time this action is commenced.

116.    Defendant Behrens has served as a member of the Sarepta Board since March 2009 and was appointed Chairwoman of the Board on April 16, 2015.  Defendant Behrens is also Chairwoman of the Audit Committee and a member of the Nominating and Corporate Governance Committee.  Defendant Behrens's large holding in Company stock, worth $1,208,354, reveals her interest in keeping the Company's stock price as high as possible.  Her large annual packages of fees, stock awards and other compensation of $416,093 in 2014 and $559,707 in 2013 evidences her not being independent.  As the most plausible inference is that the fraud alleged herein was widespread and systemic at the Company, Defendant Behrens knowingly engaged in, facilitated, concealed, and failed to disclose the fraud, or recklessly turned a blind eye to it.  Thus, as Behrens is not disinterested or independent, and as she faces a substantial likelihood of liability, demand upon her is futile and, therefore, excused.

117.    Defendant Goolsbee has served as a member of the Board since October 2007. His large Company stock holding, worth $684,206, reveals his interest in keeping the Company's stock price as high as possible.  His annual compensation from the Company of $446,093 in

2014 and $617,040 in 2013 evidences his not being independent.   As the most plausible inference is that the fraud alleged herein was widespread and systemic at the Company, Defendant Goolsbee knowingly engaged in, facilitated, concealed, and failed to disclose the fraud, or recklessly turned a blind eye to it.   Thus, as Goolsbee is not disinterested or independent, and as he faces a substantial likelihood of liability, demand upon him is futile and, therefore, excused.

118.    Defendant Price has served as a director of the Company since October 2007. Defendant Price's large Sarepta stock holding, worth $1,113,440, reveals his interest in keeping the Company's stock price as high as possible.   His annual compensation from the Company of $408,093 in 2014 and $556,707 in 2013 evidences his not being independent.   As the most plausible inference is that the fraud alleged herein was widespread and systemic at the Company, Defendant Price knowingly engaged in, facilitated, concealed, and failed to disclose the fraud, or recklessly turned a blind eye to it.   Thus, as Price is not disinterested or independent, and as he faces a substantial likelihood of liability, demand upon him is futile and, therefore, excused.

119.    Defendant Wigzell has been a member of the Board since June 2010.   His large Company stock holding, worth $736,402 reveal his interest in keeping the Company's stock price as high as possible.   His annual compensation of $392,093 in 2014 and $541,123 in 2013 evidences his not being independent.   As the most plausible inference is that the fraud alleged herein was widespread and systemic at the Company, Defendant Wigzell knowingly engaged in, facilitated, concealed, and failed to disclose the fraud, or recklessly turned a blind eye to it. Thus, as Wigzell is not disinterested or independent, and as he faces a substantial likelihood of liability, demand upon him is futile and, therefore, excused.

120.     Demand is excused as to the four Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make the false and misleading statements and omissions of material fact, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

121.     In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein.  The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors.  As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

122.     The Director-Defendants, as members of the Board, were and are subject to the Code of Ethics.  The Code of Ethics goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations.  The Code of Ethics requires the directors to also adhere to Sarepta's standards of business conduct.  The Code of Ethics requires all employees, officers and directors to avoid activities or relationships that conflict with the Company's interests or adversely affect the Company's reputation.  The Director-Defendants did not comply with the requirements of the Code of Ethics.  The Director-Defendants violated the Code of Ethics because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein.  Because the Director-

Defendants violated the Code of Ethics, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

123.    The Director-Defendants have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders.  These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.  Thus, any demand on the Director-Defendants would be futile.

124.    Sarepta has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Sarepta any part of the damages Sarepta suffered, and will continue to suffer, thereby.  Thus, any demand on the Director-Defendants would be futile.

125.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).  As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

126.    The acts complained of herein constitute violations of fiduciary duties owed by Sarepta's officers and directors, and these acts are incapable of ratification.

127.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Sarepta.  If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion."  As a result, if the Director-Defendants were to sue themselves or certain of the officers of Sarepta, there would be no directors' and officers' insurance protection.  Accordingly, the Director-Defendants cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Director-Defendants is futile and, therefore, excused.

128.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Sarepta to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

129.    Thus, for all of the reasons set forth above, all of the Director-Defendants cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

130.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

131.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Sarepta's business and affairs.

132.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

133.    The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Sarepta.

134.    In breach of their fiduciary duties owed to Sarepta, the Individual Defendants caused the Company to fail to disclose that:  (1) Sarepta provided insufficient data for its NDA submission of eteplirsen; (2) the Company's NDA for eteplirsen would likely be filed in mid-2015, not by the end of 2014; and therefore, (3) the Company's statements about its business, operations, and projections, including statements about eteplirsen's prospects for FDA approval, were materially false and misleading and/or lacked a reasonable basis.

135.    The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced, rendering them personally liable to the Company for breaching their fiduciary duties.  The

Company common stock was artificially inflated due to the false and misleading statements of material fact.

136.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations.   The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Sarepta's securities.

137.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls.   The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them.   Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Sarepta's securities.

138.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

139.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Sarepta has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

140.    Plaintiff on behalf of Sarepta has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Unjust Enrichment

141.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

142.    By their wrongful acts, breach of contract, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and detriment to, Sarepta.

143.    The Individual Defendants either benefited financially from the improper conduct and misleading statements, or received bonuses, stock options, or similar compensation from Sarepta that was tied to the performance or artificially inflated valuation of Sarepta, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct and of certain of the Individual Defendants' breach of their employment agreements.

144.    Plaintiff, as a shareholder and a representative of Sarepta, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits -- including from benefits and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties, and, as to certain of them, breach of their employment agreements.

145.    Plaintiff on behalf of Sarepta has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Abuse of Control

146.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

147.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Sarepta, for which they are legally responsible.

148.    As a direct and proximate result of the Individual Defendants' abuse of control, Sarepta has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Sarepta has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

149.    Plaintiff on behalf of Sarepta has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Gross Mismanagement

150.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

151.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Sarepta in a manner consistent with the operations of a publicly-held corporation.

152.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Sarepta has sustained and will continue to sustain significant damages.

153.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

154.   Plaintiff, on behalf of Sarepta, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

155.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

156.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Sarepta to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, and to lose business from customers who no longer trust the Company.

157.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

158.   Plaintiff on behalf of Sarepta has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Sarepta, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and

abetted the breach of their fiduciary duties to Sarepta;

(c)     Determining and awarding to Sarepta the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Sarepta and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Sarepta and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. A proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. A provision to permit the shareholders of Sarepta to nominate at least four candidates for election to the board; and

3. A proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Sarepta restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and

proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: March 16, 2016                    Respectfully submitted,

**HUTCHINGS, BARSAMIAN, MANDELCORN & ROBINSON, LLP**

***/s/Theodore M. Hess-Mahan***
Theodore M. Hess-Mahan
110 Cedar Street, Suite 250
Wellesley Hills, MA 02481
Telephone: (781) 431-2231
Facsimile: (781) 431-8726
Email: thess-mahan@hutchingsbarsamian.com

*Liaison Counsel for Plaintiff*

**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown
New York Bar No. 4301495
127A Cove Road
Oyster Bay Cove, NY 11771
Telephone: (516) 922-5427
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*